UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
BENITO RODRIGO FAJARDO TARQUI and
LUIS A. FARJARDO, as Administrators of the
Estate of MARIA T. QUIRIDUMBAY, Deceased,

                      Plaintiffs,                  Case No. 14-CV-3523 (KMK)

      -against-

UNITED STATES OF AMERICA,

                      Defendant.

and

EMERGENCY MEDICAL ASSOCIATION OF
NEW YORK, P.C., HYUN CHUNG, M.D., and
SACHIN SHAH, M.D.,

                Intervenor Defendants.
---------------------------------------------------------------X

### Notice of Motion for Summary Judgment

**PLEASE TAKE NOTICE,** that upon the annexed Motion for Summary

Judgment dated the 8th day of November, 2016, and upon the exhibits annexed thereto,

and upon all of the prior papers and proceedings had herein, the Plaintiffs, BENITO

RODRIGO FAJARDO TARQUI and LUIS A. FARJARDO, as Administrators of the

Estate of MARIA T. QUIRIDUMBAY, Deceased, will move this Court at the United

States District Court for the Southern District of New York, before the Honorable Judge

Kenneth Karas, located at 300 Quarropas Street, Courtroom 521, White Plains, New

York, 10601, with Oral Argument at a date and time to be determined by the Court, for

an Order pursuant to Fed. R.Civ.P. 56, seeking summary judgment against the defendant,

UNITED STATES OF AMERICA on the issue of liability, and for such other and further

relief as this Court may deem just and proper.

Dated: Brooklyn, New York
      November 8, 2016

                    Yours' etc.

                    Andrew M. Friedman, ESQ. (AF-7122)
                    FRIEDMAN SANCHEZ, LLP
                    Attorneys for Plaintiffs
                    16 Court Street - Suite 2600
                    Brooklyn, New York 11241
                    (718) 797-2488

TO:  Shane Cargo, Esq.
      Attorney for Defendant
      United States Attorney's Office
      Southern District of New York
      Civil Division
      86 Chambers St.
      New York, N.Y. 10007
      (212) 637-2711

      John J. Corgan, Esq.
      Schiavetti Corgan Socsia DiEdwards & Nicholson, LLP
      Attorneys for Intervenor Defendant
      Emergency Medical Association of New York, P.C.
      709 Westchester Avenue, Suite 205
      White Plains, New York 10604
      (914) 946-0400

      Thomas J. Gerspach, Esq.
      Attorney for Intervenor Defendant CHUNG
      Gerspach Sikoscow  LLP
      40 Fulton Street  Suite 1402
      New York, New York 10038
      (212) 422-0700

      Gary W. Patterson, Jr., Esq.
      Attorney for Intervenor Defendant SHAH
      Vigorito, Barker, Porter, & Patterson LLP
      115 E. Stevens Avenue, Ste. 206

Valhalla, New York 10595
(914) 495-4806

# TABLE OF CONTENTS

**Page**

Table of Authorities................................................................................i

Preliminary Statement .........................................................................1

Procedural History ...............................................................................2

Factual History As to The OB/GYN Care……...................................2

Expert Reports…..................................................................................6

    OB/GYN Expert-Douglas Phillips, MD…….....................................6
    Infectious Disease Expert-Michael Bergman, MD…...........................8
    Emergency Medicine Expert-Ira Mehlman, MD….............................10
    Intervenor Defendants' Expert Reports….........................................11
    Defendant's Expert Report…...........................................................12

Argument

Standard of Review for Summary Judgment…......................................13

Point One
    PLAINTIFFS HAVE CLEARLY ESTABLISHED A *Prima Facie* CASE OF
    MEDICAL MALPRACTICE AGAINST DEFENDANT, AND THERE IS NO
    GENUINE ISSUE OF FACT WITH RESPECT TO DEFENDANT'S DEVIATIONS
    FROM THE STANDARD OF CARE AND LIABILITY FOR MARIA
    QUIRIDUMBAY'S WRONGFUL DEATH….....................................14

Point Two
    EVEN IF DEFENDANT SOMEHOW OBTAINS A FAVORABLE EXPERT OPINION
    AT THIS LATE JUNCTURE, OR IF THE DEFENDANT'S OWN WITNESSES
    SOMEHOW ASSERT THAT THEIR MEDICAL CARE MET THE STANDARD OF
    CARE, SUCH AN OPINION WOULD STILL BE INSUFFICIENT TO DEFEAT
    SUMMARY JUDGMENT ON THESE FACTS….................................16

Conclusion .........................................................................................17

# **TABLE OF AUTHORITIES**

## **Cases**

*Alvarez v. Prospect Hosp.*, 68 N.Y.2d 320, 508 N.Y.S.2d 923, 501 N.E.2d 572) ...............1, 15

*Barila v. Comprehensive Pain Care of Long Island,* 44 A.D.3d 806, 844 N.Y.S.2d 103

(2d Dept. 2007)..............................................................................................................15

*Barnes v. Cisneros,* 15 A.D.3d 514, 790 N.Y.S.2d 513 (2d Dept. 2005)....................................16

*Berger v. Becker,* 272 A.D.2d 565, 709 N.Y.S.2d 418.................................................................15

*Blackmon v. Dinstuhl,* 27 A.D.3d 241, 810 N.Y.S.2d 79 (1st Dept. 2006)................................16

*Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1,* 16 F. Supp. 3d 294, 314

(S.D.N.Y. 2014)..............................................................................................................13

*Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir. 2011).........................................................13, 14

*Derdiarian v. Felix Contr. Corp.,* 51 N.Y.2d 308, 434 N.Y.S.2d 166, 414 N.E.2d 666 (1980).14

*Gaddy v. Eyler,* 79 N.Y.2d 955, 582 N.Y.S.2d 990 (1992).........................................................16

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.,* 386 F.3d 485, 495 (2d Cir. 2004) ...................14

*Giannakis v. Paschilidou,* 212 A.D.2d 502, 622 N.Y.S.2d 112 (2d Dept. 1995)........................17

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* MDL No. 1358, No. M21–88, 2014 WL

840955, at 2 (S.D.N.Y. Mar. 3, 2014) ...............................................................................14

*Israel v. Fairharbor Owners, Inc.,* 20 A.D.3d 392, 798 N.Y.S.2d 139 (2d Dept. 2005) ............16

*Koehler v. Schwartz,* 48 N.Y.2d 807, 424 N.Y.S.2d 119, 399 N.E.2d 1140 (1979) ....................15

*Lopez v. Senatore,* 65 N.Y.2d 1017, 494 N.Y.S.2d 101 (1985) ...................................................16

*Lyons v. McCauley,* 252 A.D.2d 516, 675 N.Y.S.2d 375 (2d Dept.1998)....................................15

*Marte v. NYCTA,* 253 A.D.2d 519, 677 N.Y.S.2d 152 (2d Dept. 1998) ......................................

*Phillips v. Bronx Lebanon Hosp.,* 268 A.D.2d 318, 701 N.Y.S.2d 403 (1st. Dept. 2000)..........16

i

*Psihoyos v. John Wiley & Sons, Inc.,* 748 F.3d 120, 123–24 (2d Cir. 2014) .............................13

Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene, 746 F.3d 538, 544 (2d Cir.

2014) ...........................................................................................................................................13

*Salem v. Rosenberg,* 261 A.D.2d 261 A.D.2d 601 (2d Dept, 1999)............................................17

*Sosna v. American Home Products,* 298 A.D.2d 158, 748 N.Y.S.2d 548 (1st Dept. 2002)........16

*Vt. Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir. 2004)..........................13

*Walker v. City of N.Y.*, No. 11-CV-2941, 2014 WL 1244778, at 5

(S.D.N.Y. Mar. 26, 2014) ..........................................................................................................13

*Wrobel v. Cty. of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) ..............................................................13

## Statutes

*Fed. R. Civ. P. 56(a)*..................................................................................................................13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
BENITO RODRIGO FAJARDO TARQUI and
LUIS A. FARJARDO, as Administrators of the
Estate of MARIA T. QUIRIDUMBAY, Deceased,

                       Plaintiffs,                     Case No. 14-CV-3523 (KMK)

        -against-

UNITED STATES OF AMERICA,

                       Defendant.

and

EMERGENCY MEDICAL ASSOCIATION OF
NEW YORK, P.C., HYUN CHUNG, M.D., and
SACHIN SHAH, M.D.,

                Intervenor Defendants.
----------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY AS AGAINST THE UNITED STATES OF AMERICA

### PRELIMINARY STATEMENT

This action arises out of the tragic July 29, 2010 death of plaintiffs' decedent, Maria Quiridumbay a 35 year-old mother of two young children. Ms. Quiridumbay died from sepsis secondary to an improperly treated Streptococcus Pyogenes Group A infection. The infection was initially diagnosed at Hudson Valley Hospital Center (HVHC) in the early morning of July 14, 2010 soon after the July 13, 2010, 4:10 p.m., delivery of Ms. Quirdumbay's baby girl, Kimberly. Despite that diagnosis, the infection was not properly treated by the defendant's agents, servants and employees, and in particular by Drs. Rashmi Kar and Sara Jordan the attending Obstetrician/Gynecologists (OB/GYNS). As a result of defendant's departures from

the standard of care in failing to treat the infection, the infection fulminated and Ms.

Quiridumbay suffered an untimely and wrongful death.

As set forth in the medical records and other record evidence herein it is difficult to

imagine a more obvious case of malpractice than this one. Accordingly, the granting of summary

judgment on the issue of liability in favor of plaintiffs and against the United States of America

is mandated.

## PROCEDURAL HISTORY

Following the December 19, 2013 denial of plaintiffs' Administrative Tort Claim this

action was initiated by the filing of a Summons and Complaint on May 16, 2014. Defendant

interposed its Answer on July 15, 2014. A companion State Court action against the Intervenor

Defendants had been previously commenced. By the January 26, 2015 Order of this Court the

Intervenor Defendants' motion to Intervene was granted without opposition. Discovery then

proceeded and is now concluded. Plaintiffs and the United States timely filed their respective

expert reports. After the substitution of counsel and an extension of time to file the Intervenor

Defendants also timely filed their respective expert reports. No party conducted expert

depositions, and the time to complete same expired on July 29, 2016.

Leave to move for summary judgment was granted by this Court, and this motion now

ensues.

## FACTUAL HISTORY AS TO THE OB/GYN CARE

Maria Quiridumbay received all her pre-natal care through providers at the Hudson River

Health Clinic (HRHC), a federally funded health clinic. At the clinic her gynecological and pre-

natal care was provided primarily by Rashmi Kar, MD and Sara Jordan, MD. Her pre-natal

course was uneventful except for episodic flare-ups of joint pain secondary to her known and pre-existing rheumatoid arthritis for which she had been prescribed steroids on a long-term basis.

On July 13, 2010 Ms. Quiridumbay was admitted to the HVHC for labor and delivery. *See,* Exhibit C-1. All of the medical doctors and nurse midwifes involved in her labor and delivery care were employees of HRHC. During the labor and delivery admission, Drs. Kar and Jordan remained the principal OB/GYNs. Certified Nurse-Midwifes Ingrid Garcia-Deler and Janet Brooks also participated in the labor and delivery and post-partum care of Ms. Quiridumbay.

As set forth in the July 13, 2010, 4:10 p.m., Delivery Note, Ms. Quiridumbay had a normal spontaneous vaginal delivery, and her baby daughter was born at 3:40 p.m. *See,* Exhibit C-1. Following her birth the baby was admitted to the Neo-Natal ICU (NICU) secondary to her mother's post-partum fever, and the infant's presumed sepsis. The baby was treated for sepsis in the NICU with a five day course of antibiotics. *See,* Exhibit D.

On July 14, 2010 between 12:40 a.m. and 12:51 a.m., Ms. Quiridumbay's fever spiked to 102.2 with complaints of chills and shivering. *See,* Exhibit C-3 at p. 10-11. Later at 5:05 p.m. on July 14, the mid-wife noted a continuing fever of 101.9 with complaints of hip pain and cramps. *See,* Exhibit C-1. Dr. Kar then ordered a CBC and blood, urine and vaginal cultures. Antibiotic therapy was started to treat the presumed infection. *See,* Exhibit C-1 and C-2. *See also,* Exhibit F at p. 14-15. At 10:00 p.m. on July 14 the hospital lab results showed an elevation in the patient's white blood count with bands meaning there was a left shift, thereby confirming the presumptive diagnosis of infection. These results were reported to CNM Janet Brooks, who informed Dr. Kar. *See,* Exhibit C-3, at p. 6, *see also,* Exhibit G at p. 17-20. The records further reflect that a Nurse Eileen Rossi also told Dr. Kar that the lab had reported many Beta Strep

Group A. *See*, Exhibit C-3 at p. 3. *See also,* Exhibit G at p. 31-32. On July 15, at 7:16 a.m., the

lab again advised CNM Brooks of the positive blood culture results. *See,* Exhibit C-3 at p. 4.

Despite those laboratory results, at 11:45 a.m., on July 15, 2010 after consulting with Dr.

Jordan, Dr. Kar ordered the discontinuation of antibiotics. *See,* Exhibit C-2, Exhibit G at p. 37.

At the time she ordered the discontinuation of antibiotics, Dr. Kar knew that the patient needed

antibiotic therapy and that the standard of care required such treatment. Thus, she testified as

follows:

Q.      Do you recall the sum and substance of that conversation?

A.      I think it was the second day that I was notified that the cultures are back.

Q.      In addition to being notified that the cultures are back, were you informed
of anything about the cultures?

A.      I don't recall completely the conversation, but the gist was that I was
notified that, Dr. Kar, the culture are such and such, something to that extent.

Q.      When you say that the cultures are such and such, what does such and
such mean?

A.      The cultures are back. The organism is gram positive cocci. I think it was
that. I'm not 100 percent sure. It has been long.

Q.      What does that mean gram positive cocci?

A.      Gram positive cocci is bacteria that can cause infections, and you need to
have the patient on antibiotics to bring it down.

Q.      When you say you need to have the patient on antibiotics, why do you say
that?

A.      Because that is the – it can—it depends where the organism has been
cultured from, where it is growing from, because it can seed in different parts of
the body and the patient can be sick.

Q.      What does that mean to seed in different parts of the body?

A.      It can spread.

4

Q.    When you say it can spread, what can spread?

A.    The organism.

Q.    And the organism, that is an infectious process?

A.    Yes.

Q.    If an infectious spreads and is not treated with antibiotics, what happens?

A.    The patient can be really sick, and I mean you have to treat the patient.

Q.    Is the standard of care to treat that patient?

A.    Yes.

*See*, Exhibit F at p. 18-20.

Twenty-two minutes later, at 12:07 p.m. the preliminary genital culture identified Ms.

Quiridumbay's infection as a Strep. Pyogenes. Group A, which result was called into labor and

delivery and confirmed by Nurse Rossi. *See*, Exhibit C-3 at p. 114. Notwithstanding the positive

lab results, no antibiotic therapy was reinstituted by Drs. Kar or Jordan. Ms. Quiridumbay was

discharged on July 15, 2010 without having received any further antibiotic therapy, and without

an order or instruction for further antibiotic therapy. Blood work drawn at the post-partum exam

on July 16 continued to demonstrate the presence of infection with multiple abnormal findings.

*See*, Exhibit C-4.

On July 26, 2010 Ms. Quiridumbay presented to the HVHC emergency department. Dr.

Kar spoke via telephone with HVHC emergency department personnel about Ms. Quiridumbay's

case. Yet again no antibiotic therapy was initiated, and Ms. Quiridumbay was sent home with

only pain medicine. *See*, Exhibit C-5, *see also*, F at p. 44-45, 94.

Ms. Quiridumbay was never administered any further antibiotic therapy by anyone at or

connected with HVHC. After being seen at HVHC on July 28, 2010, Ms. Quiridumbay presented

later that day to the Westchester Medical Center (WMC). At WMC, she was immediately

diagnosed as being in septic shock, and a course of antibiotic therapy was initiated.

Unfortunately, On July 29, 2010 Ms. Quiridumbay expired secondary to septic shock caused by

endometritis. *See,* Exhibit E.

## EXPERT REPORTS

During discovery herein plaintiffs exchanged reports from three different board certified

medical experts each of whom opined that the OB/GYN care rendered to Ms. Quiridumbay was

deficient in multiple respects, and that those deviations from the standard of care proximately

caused her demise. A brief review of the expert reports plainly establishes Drs. Jordan and Kars'

departures from the standard of care.

### OB/GYN Expert Douglas Phillips, MD

"With a reasonable degree of medical certainty and probability, the attending physicians and staff at Hudson Valley Hospital deviated from accepted medical standards, and these deviations were substantial factors in causing the death of Maria Quiridumbay.

The risk for harm to Ms. Maria Quiridumbay was substantially increased due to the following acts of negligence and omissions:

1) Failure to perform a pelvic exam with a presumed diagnosis of postpartum endometritis. Uterine tenderness is a key finding in a woman with endometritis;

2) Failure to use a total of three blood culture sets. Only one set was used which is rarely advisable or sufficient. A positive single culture may not be interpretable unless an unequivocal pathogen is isolated. If a possible contaminant is reported on a single culture, additional culture data are needed, and in interim, unnecessary antimicrobial therapy or unnecessary testing may be pursued. Blood cultures are especially useful if the patient is immunocompromised as she was;

6

> 3) Failure to get an Infectious Disease consult in the presence of
> an immunocompromised patient with a presumed postpartum
> endometritis with symptoms consistent and confirmed by blood
> cultures indicative of a GAS infection; and

> 4) Failure to continue antibiotics until patient is clinically
> improved (no fundal tenderness) and afebrile for at least 24
> hours. If bacteremia is present as indicated by a positive blood
> culture, oral antibiotic therapy after discontinuation of parenteral
> antibiotics is required to complete a seven-day total course of
> antibiotic therapy."

*See,* Exhibit I.

After his review of the depositions herein Dr. Phillips further opined as to the

gynecological departures as follows:

> "In addition to the acts of negligence and omissions cited in my
> 06/22/2015 Report, the risk for harm to Ms. Maria Quiridumbay
> was substantially increased due to the following acts of negligence
> and omissions:

> 1) Failure to perform a pelvic exam with a presumed diagnosis of
> postpartum endometritis. Uterine tenderness is a key finding in a
> woman with endometritis;

> 2) Failure to use a total of three blood culture sets. Only one set
> was used which is rarely advisable or sufficient. A positive single
> culture may not be interpretable unless an unequivocal pathogen is
> isolated. If a possible contaminant is reported on a single culture,
> additional culture data are needed, and in interim, unnecessary
> antimicrobial therapy or unnecessary testing may be pursued.
> Blood cultures are especially useful if the patient is
> immunocompromised as she was. Dr. Kar in her deposition
> testimony stated that two sets of blood cultures was required (p.
> 15) and although three blood culture sets should have been
> obtained, clearly she realized one set of cultures is not sufficient;

> 3) Failure to get an Infectious Disease consult in the presence of an
> immunocompromised patient with a presumed postpartum
> endometritis with symptoms consistent and confirmed by blood
> cultures indicative of a GAS infection; and

> 4) Failure to continue antibiotics until patient is clinically
> improved (no fundal tenderness) and afebrile for at least 24 hours.

If bacteremia is present as indicated by a positive blood culture, oral antibiotic therapy after discontinuation of parenteral antibiotics is required to complete a seven-day total course of antibiotic therapy.

All of my opinions, which are offered within a reasonable degree of medical probability and certainty, are based solely on the medical documentation reviewed and are subject to modification if and when any additional documentation is subsequently forwarded for review."

*See,* Exhibit I.

### Infectious Disease Expert, Michael Bergman, MD

With respect to the care provided by the OB/GYNs, Dr. Bergman opined as follows:

Maria Quiridumbay died of undertreatment of her bacteremia that was present on July 13, 2010. When a postpartum patient has streptococci in the blood, aggressive, prolonged use of appropriate anti-streptococcal antibiotic therapy is mandatory, along with addressing the source of this infection. None of these crucial steps were performed here and the patient died approximately two weeks later of endometritis...**[comments as to other providers omitted]**

It can be stated, within a reasonable degree of certainty that the Hudson Valley Hospital was negligent in discharging Maria Quiridumbay on July 15, 2010 with recent fevers, leukocytosis (white blood cell count elevation) and left shift in the absence of antibiotic therapy. Similarly, the failure of antibiotic therapy to be administered continued even after Nurse Hutchings supposedly communicated the presence of positive blood cultures to the HRHC provider on July 15, 2010.

Even when Maria Quiridumbay returned to the EW on July 26 and July 28, 2010 no caretaker took an accurate history that should have established the presence of this undertreated bacteremic endometritis. This responsibility was shared by multiple individuals including Drs. Kar, Chung and the hospital as well as its allied personnel such as the hospital PA Lindsay Aarsted.

It is my opinion that, as late as the July 26, 2010 EW visit and possibly even later, had appropriate intravenous antibiotic and

> surgical therapies been administered, Maria Quiridumbay
> would have survived and been able to continue to care for her
> husband and daughter.
>
> All statements made are done within a reasonable degree of
> medical certainty.

*See,* Exhibit J.

Again, after reviewing the deposition testimony, Dr. Bergman's opinions were

reinforced. Thus, he further opined that:

> The depositions of Drs.Rashmi Kar, Sachin Shah, nurse midwife
> Ingrid Deler-Garcia and Nurse Lindsay Seekircher were all taken
> following my earlier report but none of these depositions
> materially affected my earlier findings and conclusions. Salient
> highlights from these newly reviewed depositions are
> summarized.
>
> 1) Dr. Rashmi Kar, an Obstetrician was indeed aware that Maria
>    Quiridumbay suffered from rheumatoid arthritis, an autoimmune,
>    immune suppressive disorder and that the patient was receiving
>    prednisone for that condition. Dr. Kar noted in her deposition that
>    he was contacted by Janet Brooks, a nurse midwife at that Maria
>    began to have fever on her second postpartum day (July 15,
>    2010) while at Hudson Valley Hospital. Dr. Kar ordered that
>    cultures of blood, urine and vaginal secretions be obtained as
>    well as beginning empiric antibiotics.
>
> 2) Dr. Sara Jordan was the on-call physician that day and a decision
>    was made to stop antibiotic therapy. No Infectious Disease
>    consultation was obtained, not by Dr. Kar nor by Dr. Jordan
>    despite blood and vaginal cultures growing a streptococcal
>    species. Dr. Kar was aware both of the patient's rheumatoid
>    arthritis, her recent prednisone therapy, the positive vaginal as
>    well as the positive vaginal cultures. Despite this highly
>    suggestive scenario for the clinical diagnosis of endometritis in a
>    compromised patient, Drs. Kar and Jordan allowed this
>    potentially fatal condition to continue unchecked off of
>    intravenous antibiotic therapy and in the absence of further
>    examination or imaging to search for endometritis.
>
> 3) On July 26, 2010 Dr. Kar was contacted by Dr. Chung, an
>    Emergency Ward physician due to the onset of multiple joint
>    complaints that the patient had begun to experience. During that

EW visit, toradol and vicodin and other medications were given, some of which may suppress the ability of a patient to mount a fever. In addition, Maria's white blood cell count was over 20,000 (more than twice normal) and she had a left shift on her CBC which is entirely consistent with infection and virtually no other inflammatory condition was conceivable at that time.

4) Further, in his (sic) deposition, Dr. Kar admits that he never inquired as to the medical condition of the baby in this case who was ill with sepsis (severe infection) early in the neonatal period.

5) Another criticism of Dr. Kar focuses on the admission in his deposition (page 49) that endometritis was on his differential diagnosis of an ill postpartum woman with fever, positive vaginal and blood cultures, yet no further examination or imaging studies were done and antibiotic therapy was discontinued very prematurely for this potentially fatal condition.

*See*, Exhibit J.

**Emergency Medicine Expert-Ira Mehlman, MD**

Finally, plaintiffs' Emergency Medicine expert, Ira Mehlman, MD also lays bare the departures committed by the Defendant's OB/GYN personnel, as follows:

"In summary, Maria Quiridumbay was a 35 year old Hispanic female who delivered her second child 7/13/10, who was septic at birth. Postpartum Maria spiked three fevers and was found to have an elevated WBC with left shift, and blood culture was positive for Strep group A. She was treated as probable post-partum endometritis for two days with iv antibiotics which for unknown inexplicable reasons were not continued beyond two days. She was discharged to home on 7/15/10, developed musculoskeletal complaints and swelling, continued to run very elevated WBC with left shift, and despite multiple visits to Hudson Valley Medical Center postpartum. 7/26/10 and 7/28/10 with progressive musculoskeletal complaints felt to be "rheumatoid arthritis" did poorly deteriorating. Inexplicably, despite the clear known facts of her post-partum incompletely treated infection, no connection was made between that and her unexplained complaints and failure to do well on the subsequent visits. Finally, too late she was sent by visiting nurse

services to WCMC ED where she was in septic shock with SIRS and multi-organ system failure and died 7/29/10.

The OB-GYN service and her treating doctors failed to meet the standards of care and contributed to her unnecessary death. After she was diagnosed as having probable postpartum endometritis with+ blood cultures and very elevated WBC, she was treated with an inadequate incomplete course of antibiotics. Drs. Kar and Jordan, and the rest of the OB-GYN treating team failed to perform a complete and appropriate history and appreciate its clinical significance. These same doctors and team failed to appreciate the full exam and finding and ancillary tests including the persistent elevated WBC with left shift and the positive blood culture and the clinical significance of this. The same doctors failed to treat with appropriate antibiotics for appropriate length of time, thus, inadequately treating this patient. Had they continued correct antibiotics for appropriate time, patient Maria would have done well. They discharged Maria prematurely and incompletely treated her, deviating from standards of care, causing her harm and ultimately her unnecessary painful death.

*See,* Exhibit K.

### Intervenor Defendants' Expert Reports

Significantly, the Export Reports exchanged by the Intervenor Defendants concur with plaintiffs as to the Drs. Kar and Jordan's departures from the standard of care. In this regard, Adiel Fleischer, MD, a board certified OB/GYN opined that:

> Drs. Kar and Jordan departed from accepted practice in discontinuing antibiotics and discharging the patient without further antibiotic treatment on July 15, 2010, in light of the patient's positive blood and vaginal cultures, elevated white count, and elevated bands. This was a significant error in clinical judgment and is the direct cause of the patient's death.

*See,* Exhibit M.

Similarly, Stanley Yancowitz, MD, an Infectious Disease expert set forth that:

> This unfortunate patient developed postpartum endometritis and sepsis with streptococcus pyogenes. This diagnosis should

have been abundantly clear to her obstetricians, Drs. Kar and
Jordan. They were aware of her initial fever, positive blood
culture, and severely elevated white blood counts with markedly
elevated band forms which indicated a severe septic state. Dr.
Kar's decision to discontinue antibiotics in the face of a positive
culture for a streptococcus (gram positive in chains) and white
count of this magnitude is a departure from the standard of care.
Dr. Jordan's decision to give no further antibiotics after one day is
an even more flagrant departure from the standard of care. If these
obstetricians had made the correct diagnosis which was clearly
evident from the data they had, she could have been readily treated
with an appropriate 10-14 day course of IV antibiotics and would
certainly have had an excellent outcome and full recovery.

*See,* Exhibit N.

Finally, the two other expert reports submitted by the Intervenor Defendants both concur

that the cause of Ms. Quiridumbay's death was the under treatment of her infection.  *See,*

Exhibits O & P.

### Defendant's Expert Report

Defendant has submitted only one expert report, from Edwin Guzman, MD, also a board

certified OB/GYN. *See,* Exhibit L. Dr. Guzman simply opines that the treatment rendered by the

Intervenor Defendants constituted departures from the standard of care. Dr. Guzman is silent as

to the propriety of the care rendered by the OB/GYNs. This silence is telling and dispositive of

this motion.

Thus, at this juncture, where expert discovery is closed, and all parties have exchanged

their expert reports, no expert has offered an opinion that the care rendered by the OB/GYNs was

within the standard of care. For this reason, plaintiffs submit that summary judgment as to the

liability of the defendant is mandated.

### Argument

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(a)*; see also, Psihoyos v. John Wiley & Sons, Inc.,* 748 F.3d 120, 123–24 (2d Cir. 2014*) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and ... resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also, Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1,* 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

Further, "[t]o survive a [summary judgment] motion ..., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that [her] allegations were correct; [s]he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. Cty. Of Erie,* 692 F.3d 22, 30 (2d Cir. 2012)(emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of N.Y.*, No. 11-CV-2941, 2014 WL 1244778, at 5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord,* 554 F.3d 255, 266 (2d Cir. 2009)).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At summary

judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod,* 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* MDL No. 1358, No. M21–88, 2014 WL 840955, at 2 (S.D.N.Y. Mar. 3, 2014) (same). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.,* 386 F.3d 485, 495 (2d Cir. 2004*) (*internal quotation marks removed) *(quoting Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24 (1986).

Here, defendant's own witnesses, medical records and expert submission supply both the detailed evidence of the numerous shocking departures from good and accepted medical practice as well as indisputable evidence of causation with respect to decedent's tragic death. Defendant cannot now demonstrate any specific facts to the contrary. This is simply one of those rare medical malpractice cases which is ripe for summary judgment in favor of the plaintiff.

**Point One**

**PLAINTIFFS HAVE CLEARLY ESTABLISHED A *Prima Facie* CASE OF MEDICAL MALPRACTICE AGAINST DEFENDANT, AND THERE IS NO GENUINE ISSUE OF FACT WITH RESPECT TO DEFENDANT'S DEVIATIONS FROM THE STANDARD OF CARE AND LIABILITY FOR MARIA QUIRIDUMBAY'S WRONGFUL DEATH**

Under New York State law, a movant for summary judgment must make a "*prima facie* showing of his or her entitlement to judgment as a matter of law, tendering sufficient [non-hearsay] evidence to eliminate any material issues of fact." To carry the burden of proving a *prima facie* case, the plaintiff must generally show that the defendant's negligence was a substantial factor in producing the injury. *See, Derdiarian v. Felix Contr. Corp.,* 51 N.Y.2d 308, 434 N.Y.S.2d 166, 414 N.E.2d 666 (1980).

Expert testimony is necessary to prove a deviation from accepted standards of medical care and to establish proximate cause unless the matter is one which is within the experience and observation of the ordinary juror. *See*, *Koehler v. Schwartz*, 48 N.Y.2d 807, 424 N.Y.S.2d 119, 399 N.E.2d 1140 (1979); *Lyons v. McCauley*, 252 A.D.2d 516, 675 N.Y.S.2d 375 (2d Dept.1998).

In *Barila v. Comprehensive Pain Care of Long Island*, 44 A.D.3d 806, 844 N.Y.S.2d 103 (2d Dept. 2007) the Appellate Division held:

"To establish a prima facie case of liability in a medical malpractice action, a plaintiff must prove (1) the standard of care in the locality where the treatment occurred, (2) that the defendant breached that standard of care, and (3) that the breach of the standard was the proximate cause of injury" (*Berger v. Becker*, 272 A.D.2d 565, 709 N.Y.S.2d 418 [citations omitted]; *see Alvarez v. Prospect Hosp.*, 68 N.Y.2d 320, 508 N.Y.S.2d 923, 501 N.E.2d 572). "Expert testimony is necessary to prove a deviation from accepted standards of medical care and to establish proximate cause unless the matter is one which is within the experience and observation of the ordinary juror" (*Lyons v. McCauley, 252 A.D.2d 516, 517, 675 N.Y.S.2d 375*, citing *Koehler v. Schwartz*, 48 N.Y.2d 807, 424 N.Y.S.2d 119, 399 N.E.2d 1140).

As set forth above, all experts either agree that OB/GYNs departed from the standard of care or are silent as to the OB/GYNs treatment. There is not now any expert who opines that the OB/GYN care comported with the standard of care. Dr. Guzman's report utterly fails to create any issues in this regard as he does not contradict plaintiffs' experts on the most critical issues surrounding the claim of malpractice; to wit that the OB/GYNs failed to properly and adequately treat Ms. Quiridumbay's diagnosed infection. Indeed, it is undisputed that no antibiotic treatment was actually provided between July 15 and July 28, 2010.

As to causation, there too it is apparent that the Ms. Quiridumbay's death was caused by the defendant's many departures form the standard of care as set forth by all experts herein. Dr. Guzman merely opines that the other departures committed by the Intervenor Defendants were also causes of her death. This is not disputed by plaintiffs. That fact, however, merely goes to the issue of apportionment of fault and not liability.

Point Two

**EVEN IF DEFENDANT SOMEHOW OBTAINS A FAVORABLE EXPERT OPINION AT THIS LATE JUNCTURE, OR IF THE DEFENDANT'S OWN WITNESSES SOMEHOW ASSERT THAT THEIR MEDICAL CARE MET THE STANDARD OF CARE, SUCH AN OPINION WOULD STILL BE <u>INSUFFICIENT TO DEFEAT SUMMARY JUDGMENT ON THESE FACTS</u>**

It is conceivable that in opposition to this motion, defendant will submit reports from Dr. Kar or Dr. Jordan wherein they attempt to justify and explain away their egregious care and treatment. Plaintiffs submit, that such an attempt would be improper insofar as expert discovery has long since closed. In any event, the law is not so blind as to permit this type of gamesmanship. Such obviously tailored and patently contrived submissions designed for no other reason than to meet some statutory requirement, contradict indisputable evidence, create a feigned issue of fact, or to supply some missing fact or evidence in order to stave off or obtain summary judgment is a tactic that has been universally condemned by the courts. *Gaddy v. Eyler,* 79 N.Y.2d 955, 582 N.Y.S.2d 990 (1992)*; Lopez v. Senatore,* 65 N.Y.2d 1017, 494 N.Y.S.2d 101 (1985*); Blackmon v. Dinstuhl,* 27 A.D.3d 241, 810 N.Y.S.2d 79 (1st Dept. 2006*); Israel v. Fairharbor Owners, Inc.,* 20 A.D.3d 392, 798 N.Y.S.2d 139 (2d Dept. 2005); *Barnes v. Cisneros,* 15 A.D.3d 514, 790 N.Y.S.2d 513 (2d Dept. 2005)*; Sosna v. American Home Products,* 298 A.D.2d 158, 748 N.Y.S.2d 548 (1st Dept. 2002)*; Phillips v. Bronx Lebanon Hosp.,* 268 A.D.2d 318, 701 N.Y.S.2d 403 (1st. Dept. 2000); *Salem v.*

*Rosenberg,* 261 A.D.2d 261 A.D.2d 601 (2d Dept, 1999); *Marte v. NYCTA,* 253 A.D.2d 519, 677 N.Y.S.2d 152 (2d Dept. 1998)*; Giannakis v. Paschilidou*, 212 A.D.2d 502, 622 N.Y.S.2d 112 (2d Dept. 1995).

Consequently, even if Drs. Kar and Jordan come to their own defense with self-supporting justifications, such an effort would be unavailing. If ever there was a medical malpractice case that cries out for summary judgment in favor of a plaintiff, it is this case wherein the malpractice is manifest and undeniable, and the evidence of causation is clear and unassailable.

## CONCLUSION

For the foregoing reasons plaintiffs submit that summary judgment as to the liability of the defendant must be granted.

Dated:  Brooklyn, New York
        November   , 2016

Yours, etc.

Andrew M. Friedman, Esq. (AF-7122)
FRIEDMAN SANCHEZ, LLP.
Attorneys for Plaintiffs
16 Court Street, 26th Floor
Brooklyn, New York 11241
(718) 797-2488

17