UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BENITO RODRIGO FAJARDO TARQUI
and LUIS A. FARJARDO, as
Administrators of the Estate of MARIA T.
QUIRIDUMBAY, Deceased,

        Plaintiffs,

        -v-

UNITED STATES of AMERICA,

        Defendant,

        and

EMERGENCY MEDICAL
ASSOCIATION of NEW YORK, P.C.,
HYUN CHUNG, M.D., SACHIN SHAH,
M.D., and RONALD NUTOVITS, M.D.,

        Intervenor Defendants.

No. 14-CV-3523 (KMK)

OPINION & ORDER

---

Appearances:

Andrew M. Friedman, Esq.
Friedman Sanchez, LLP
Brooklyn, NY
*Counsel for Plaintiffs*

Shane Cargo, Esq.
Assistant United States Attorney
United States Attorney's Office, S.D.N.Y.
New York, NY
*Counsel for the Government*

Gary W. Patterson, Jr., Esq.
Vigorito, Barker, Porter & Patterson, LLP
Valhalla, NY
*Counsel for Intervenor Defendant Sachin J. Shah, M.D.*

KENNETH M. KARAS, District Judge:

Benito Rodrigo Fajardo Tarqui and Luis A. Farjardo, as administrators of the estate of decedent Maria T. Quiridumbay ("Plaintiffs"), bring this Action against the United States of America (the "Government") for medical malpractice, loss of consortium, and wrongful death in connection with the death of Maria T. Quiridumbay ("Decedent"). Defendants Emergency Medical Association of New York, P.C. ("EMANY"), Hyun Chung, M.D. ("Dr. Chung"), Sachin Shah, M.D. ("Dr. Shah"), and Ronald Nutovits, M.D. ("Dr. Nutovits," and together with EMANY, Dr. Chung, and Dr. Shah, the "Intervenor Defendants"), intervened in the Action. Before the Court are two Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56—one on behalf of Plaintiffs and one on behalf of Intervenor Defendant Dr. Shah (the "Motions"). (*See* Dkt. Nos. 59, 63.)[1] For the reasons to follow, both Motions are denied.

## I. Background

### A. Factual Background

On July 13, 2010, Decedent was admitted to Hudson Valley Hospital Center ("HVHC") for labor and delivery and at approximately 4:10 P.M. delivered a baby girl. (*See* Pls.' Statement of Undisputed Facts Pursuant to Rule 56.1 ("Pls.' 56.1") ¶¶ 1–2 (Dkt. No. 62); Gov't's Counter-Statement Pursuant to Local Civil Rule 56.1 ("Gov't's 56.1") ¶¶ 1–2 (Dkt. No. 79).)[2] Decedent had been taking prednisone throughout her pregnancy to treat rheumatoid arthritis, (*see*

---

[1] Intervenor Defendants EMANY and Drs. Chung and Nutovits do not join in Dr. Shah's Motion and have not moved for Summary Judgment.

[2] At HVHC, Decedent was treated by Sara G. Jordan, M.D. ("Dr. Jordan") and certified nurse midwife Ingrid Deler-Garcia ("Nurse Deler-Garcia"). Both Dr. Jordan and Nurse Deler-Garcia are employees of Hudson River Health Care, Inc. and HVHC, federally funded facilities under § 224(g) of the Public Health Services Act (the "PHSA"). *See* 42 U.S.C. § 233(g). Pursuant to the PHSA, the Government was substituted as defendant.

Statement of Material Facts Pursuant to F.R.C.P. 56.1 in Supp. of the Mot. for Summ. J. on Behalf of Def. Sachin Shah, M.D. ("Shah's 56.1") ¶ 2 (Dkt. No. 66); Pls.' Counter-Statement of Material Facts Pursuant to F.R.C.P. 56.1 in Resp. to the Mot. for Summ. J. on Behalf of Def. Sachin Shah, M.D. ("Pls.' Counter 56.1") ¶ 2 (Dkt. No. 70)), and the treating medical staff at HVHC were aware of prednisone's ability to compromise Decedent's immune system and lower her temperature, (*see* Pls.' 56.1 ¶¶ 4–5; Gov't's 56.1 ¶¶ 4–5).  On July 14, 2010, the day following the birth of her daughter, Decedent had an elevated temperature.  (*See* Pls.' 56.1 ¶ 6; Gov't's 56.1 ¶ 6.)  A complete blood count ("CBC") and vaginal cultures were obtained from Decedent; the cultures were returned as positive for group A streptococcus.  (*See* Pls.' 56.1 ¶¶ 7–8; Gov't's 56.1 ¶¶ 7–8.)  "[A]ntibiotic therapy was administered" to Decedent on July 14, 2010, but was "ordered . . . discontinue[d]" on July 15, 2010.  (Pls.' 56.1 ¶¶ 9–10; Gov't's 56.1 ¶¶ 9–10.)  On the evening of July 15, 2010, Decedent "was found to be stable" and had been afebrile (without a fever) for 24 hours.  (Shah's 56.1 ¶ 9; Pls.' Counter 56.1 ¶ 9.)  Decedent was discharged from HVHC at 5:00 P.M. on July 15, 2010 and was not given a prescription for antibiotics.  (*See* Pls.' 56.1 ¶¶ 12–13; Gov't's 56.1 ¶¶ 12–13.)  On July 16, 2010, Decedent returned to HVHC for her first post-partum visit, during which "a blood culture was obtained" and laboratory results revealed no growth of bacteria.  (Shah's 56.1 ¶ 10; Pls.' Counter 56.1 ¶ 10.)

On July 26, 2010, Decedent "presented to the HVHC emergency department."  (Pls.' 56.1 ¶ 14; Gov't's 56.1 ¶ 14.)  She was not given antibiotics at that time.  (*See* Pls.' 56.1 ¶ 15; Gov't's 56.1 ¶ 15.)  Decedent had "visible edema of the left knee" and Dr. Chung ordered an X-ray of her knee.  (Shah's 56.1 ¶ 11; Pls.' Counter 56.1 ¶ 11.)  Decedent's knee "was immobilized with

an ACE wrap" and she was given painkillers and discharged with crutches.  (Shah's 56.1 ¶ 12;

Pls.' Counter 56.1 ¶ 12.)

Two days later, on July 28, 2010, at approximately 7:00 A.M., Decedent again presented

to the HVHC emergency department complaining of pain in her left knee and right hand.  (*See*

Shah's 56.1 ¶ 13; Pls.' Counter 56.1 ¶ 13.)  Decedent did not have a fever at that time.  (*See*

Shah's 56.1 ¶ 14; Pls.' Counter 56.1 ¶ 14.)  Decedent's complaints were diagnosed as related to

her arthritis and she was given pain medication which relieved her symptoms.  (*See* Shah's 56.1

¶ 15; Pls.' Counter 56.1 ¶ 15.)  Decedent "was not provided any antibiotic therapy . . . by any

provider at [HVHC]," (Pls.' 56.1 ¶¶ 16–17; Gov't's 56.1 ¶¶ 16–17), and Decedent was

discharged two hours later at approximately 9:00 A.M., "with instructions to return if she

developed fever, chills or other joint pain," (Shah's 56.1 ¶ 15; Pls.' Counter 56.1 ¶ 15).

Following her discharge on the morning of July 28, 2010, Decedent was "evaluated at

home by a Visiting Nurse Service, by non-party Registered Nurse Lavery," who noted that

Decedent "appeared dehydrated, diaphoretic (sweating heavily), drowsy and [s]low to respond

when spoken [to]."  (Shah's 56.1 ¶ 16; Pls.' Counter 56.1 ¶ 16.)  As a result, Nurse Lavery

suggested Decedent be taken to the emergency room.  (*See* Shah's 56.1 ¶ 16; Pls.' Counter 56.1

¶ 16.)

At approximately 1:51 P.M. on July 28, 2010, Decedent presented to the Westchester

Medical Center ("WMC") emergency department, where it was determined she was in septic

shock.  (*See* Pls.' 56.1 ¶¶ 18–19; Gov't's 56.1 ¶¶ 18–19; Shah's 56.1 ¶ 17; Pls.' Counter 56.1

¶ 17.)  Multiple attempts were made to increase Decedent's blood pressure until the early

morning of July 29, 2010, (*see* Shah's 56.1 ¶¶ 18–20; Pls.' Counter 56.1 ¶¶ 18–20), and

Decedent was eventually placed on a mechanical ventilator, (*see* Shah's 56.1 ¶ 20; Pls.' Counter 56.1 ¶ 20).  At approximately 5:27 A.M., Decedent's "pulse became undetectable and that time a code was called" and "CPR was started."  (Shah's 56.1 ¶ 23; Pls.' Counter 56.1 ¶ 23.)  Decedent was declared dead at 5:44 A.M.; the cause of death was "sepsis caused by endometritis."  (*See* Shah's 56.1 ¶ 23; Pls.' Counter 56.1 ¶ 23; Pls.' 56.1 ¶ 20; Gov't's 56.1 ¶ 20.)

B.  Procedural History

Plaintiffs filed the instant Action on May 16, 2014, (*see* Compl. (Dkt. No. 1)), and the Government filed its Answer on July 15, 2014, (*see* Dkt. No. 3).  On September 22, 2014, EMANY "and various physicians" filed a letter notifying the Court of their intention to intervene in the Action.  (Dkt. No. 4.)  On the same day, Plaintiffs filed a letter in opposition.  (*See* Dkt. No. 5.)  On October 3, 2014, HVHC filed a letter expressing its desire to intervene in the lawsuit. (*See* Dkt. No. 7.)  On November 21, 2014, the Court held a conference, at which it adopted a Scheduling Order for the proposed motions to intervene.  (*See* Dkt. No. 8.)  On December 19, 2014, EMANY, Dr. Chung, Dr. Shah, Dr. Nutovits, and HVHC, filed their motions to intervene and accompanying papers.  (*See* Dkt. Nos. 10–15.)  On January 13, 2015, Plaintiffs filed a letter consenting to the proposed interventions, (*see* Dkt. No. 16), and the Court granted the motions on January 26, 2015, (*see* Dkt. No. 17).  Discovery ensued and on September 7, 2016, the Parties entered into a stipulation of discontinuance as to HVHC.  (*See* Dkt. No. 52.)

On November 18, 2016, Plaintiffs filed their Motion for Summary Judgment and accompanying papers.  (*See* Dkt. Nos. 59–62.)  On November 19, 2016, Dr. Shah filed his Motion for Summary Judgment and accompanying papers.  (*See* Dkt. Nos. 63–66.)  On December 7, 2016, Plaintiffs filed their opposition to Dr. Shah's Motion, (*see* Dkt. Nos. 68–70),

and on January 11, 2017, the Government filed its opposition to Plaintiffs' Motion, (*see* Dkt. Nos. 75–79). On January 17, 2017, both Plaintiffs and Dr. Shah filed their reply papers. (*See* Dkt. Nos. 80–81.)

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same). "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks

omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009)).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No. 1358, No. M21–88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

B.  Analysis

Plaintiffs assert that they are entitled to summary judgment as they have "clearly established a prima facie case of medical malpractice against [the Government], and there is no genuine issue of fact with respect to [the Government's] deviations from the standard of care and

liability for [Decedent's] wrongful death." (Pls.' Mem. of Law in Supp. of Their Mot. for Summ. J. on the Issue of Liability as Against the United States of America ("Pls.' Mem.") 14 (Dkt. No. 60) (italics omitted).) "Under New York law, a medical malpractice plaintiff must establish (1) the standard of care where the treatment occurred, (2) that the defendant breached the standard of care, and (3) that this breach proximately caused the injury." *Meyers v. Health and Hosps. Corp.*, No. 14-CV-7448, 2016 WL 2946172, at *12 (E.D.N.Y. May 18, 2016) (internal quotation marks omitted); *see also Hogan v. A.O. Fox Mem'l Hosp.*, 346 F. App'x 627, 630 (2d Cir. 2009) (citing *Texter v. Middletown Dialysis Ctr., Inc.*, 803 N.Y.S.2d 687, 689 (App. Div. 2005)) (same).

"[I]t is incumbent upon the plaintiff to present expert testimony in support of the allegations to establish a prima facie case of malpractice." *Sitts v. United States,* 811 F.2d 736, 739 (2d Cir. 1987); *see also Shields v. United States*, 446 F. App'x 325, 326 (2d Cir. 2011) (same). "In addition to requiring expert testimony to establish the standard of care and breach, expert testimony may also be required to prove that the negligence was the proximate cause of the injury complained of." *Urena v. Wolfson*, No. 09-CV-1107, 2012 WL 958529, at *5 (E.D.N.Y. Mar. 20, 2012).

### 1. Plaintiffs' Motion for Summary Judgment

In support of their Motion, Plaintiffs cite to the reports of three experts, (*see* Decl. of Andrew M. Friedman, Esq. in Supp. of Pls.' Mot. for Summ. J. ("Friedman Decl.") Exs. I–K (Dkt. No. 61)), "each of whom opine[] that the OB/GYN care rendered to [Decedent] was deficient in multiple respects, and that those deviations from the standard of care proximately

caused her demise," (Pls.' Mem. 6). Plaintiffs' OB/GYN expert, Douglas Phillips, M.D. ("Dr. Phillips") opines that the

> following acts of negligence and omissions . . . were substantial factors in causing the death of [Decedent:] . . . 1) Failure to perform a pelvic exam with a presumed diagnosis of postpartum endometritis . . . ; 2) Failure to use a total of three blood culture sets . . . which is rarely advisable or sufficient . . . ; 3) Failure to get an Infectious Disease consult . . . ; and 4) Failure to continue antibiotics until [Decedent was] clinically improved . . [or] complete a seven-day total course of antibiotic therapy.

(*Id.* at 6–7.) Plaintiffs' Infectious Disease Expert, Michael Bergman, M.D. ("Dr. Bergman")

provides the following opinions:

> When a postpartum patient has streptococci in the blood, aggressive, prolonged use of appropriate anti-streptococcal antibiotic therapy is mandatory . . . [;] [HVHC] was negligent in discharging [Decedent] on July 15, 2010 . . . [;] failure [to administer] antibiotic therapy [was negligent] . . . [;] when [Decedent] returned to the [emergency ward] on July 26 and July 28, 2010[,] no caretaker took an accurate history that should have established the presence of . . . endometritis . . . [;] as late as . . . July 26, 2010 . . . an possibly even later, had appropriate intravenous antibiotic and surgical therapies been administered, [Decedent] would have survived . . . [; and] further examination or imaging studies [should have been] done and antibiotic therapy was discontinued very prematurely for this potentially fatal condition.

(*Id.* at 8–9.) Finally, Plaintiffs present the opinion of Emergency Medicine Expert Ira Mehlman,

M.D. ("Dr. Mehlman"), detailed as follows:

> [D]espite the clear known facts of her post-partum incompletely treated infection, no connection was made between that and her unexplained complaints . . . . [;] [Decedent] was sent . . . to [WMC] [too late] . . . [;] [Decedent] was treated with an inadequate incomplete course of antibiotics . . . [;] the OB-GYN treating team failed to perform a complete and appropriate history and appreciate its clinical significance . . . [; and] [t]he same doctors . . . discharged [Decedent] prematurely and incompletely treated her.

(*Id.* at 10–11.) Plaintiffs note that the expert reports "exchanged by . . . Intervenor Defendants concur with [P]laintiffs as to . . . departures from the standard of care," and "concur that the cause of [Decedent's] death was the under treatment of her infection." (*Id.* at 11–12.)

Plaintiffs assert that the Government "has submitted only one expert report, from . . . a board certified OB/GYN," that "is silent as to the propriety of the care rendered by the OB/GYNs," an omission Plaintiffs claim is "dispositive of this [M]otion." (*Id.* at 12.) Plaintiffs further argue that "no expert has offered an opinion that the care rendered by the OB/GYNs was within the standard of care" and "[f]or this reason, . . . summary judgment as to the liability of the [Government] is mandated." (*Id.*; *see also* Pls.' Mem. of Law in Reply to the United States' Opp'n to Pls.' Mot. for Summ. J. on the Issue of Liability as Against the United States of America ("Pls.' Reply") 1 (Dkt. No. 81) ("In that even now [the Government] offer[s] no expert opinion that the care rendered to [P]laintiffs' decedent by their OB/GYNs met the standard of care, it is clear that the instant [M]otion must be granted.").)

In opposition, the Government asserts that "[b]ecause [P]laintiffs continue to bear the burden of proof at trial, the fact that the [G]overnment has not provided an expert report [rebutting Plaintiffs' arguments] does not require summary judgment" in Plaintiffs favor. (Mem. of Law in Opp'n to Pls.' Mot. for Summ. J. ("Gov't's Opp'n") 11 (Dkt. No. 75).) Additionally, the Government contends that "[t]here are genuine disputes of material fact precluding summary judgment." (*Id.* at 13.)

"Even though [Plaintiffs'] substantive claims are governed under New York law, the procedural issues are determined under the federal standard." *Hughes v. United States*, No. 12-CV-5109, 2014 WL 929837, at *4 (S.D.N.Y. Mar. 7, 2014). As noted above, the party moving

for summary judgment bears the initial burden of showing the absence of a genuine dispute over any issues of material fact. *See Celotex Corp.*, 477 U.S. at 323. A factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Plaintiffs argue that "[a]ll experts either agree that OB/GYNs departed from the standard of care or are silent as to the OB/GYNs['] treatment" and that the report of the Government's only expert, Edwin Guzman, M.D. ("Dr. Guzman"), "utterly fails to create any issues in this regard as he does not contradict [P]laintiffs' experts on the most critical issues surrounding the claim of malpractice; to wit that the OB/GYNs failed to properly and adequately treat [Decedent's] diagnosed infection." (Pls.' Mem. 15.)

While Plaintiffs are correct that "[e]xpert testimony is necessary to prove a deviation from accepted standards of medical care and to establish proximate cause," (*id.*), such testimony in opposition is not essential to raise a triable issue of fact. "Where a plaintiff demonstrates through the affirmation of an expert that the defendant departed from accepted standards of medical care and that this departure was a substantial cause of her injuries, the burden of production shifts to the defendant to raise a triable issue of fact." *Hutchinson v. United States*, No. 01-CV-1198, 2006 WL 1154822, at *6 (E.D.N.Y. Apr. 28, 2006). The non-moving defendant may then submit "*affidavits and/or deposition testimony and medical records* which rebut [the] plaintiff's claim of medical malpractice with factual proof." *Zikianda v. County of Albany*, No. 12-CV-1194, 2015 WL 5510956, at *6 (N.D.N.Y. Sept. 15, 2015) (emphasis added) (alteration and internal quotation marks omitted); *see also McFarland v. United States*, No. 12-CV-5162, 2014 WL 6389589, at *5 (E.D.N.Y. Nov. 14, 2014) ("This burden on a motion for

summary judgment can be met by the submission of affidavits and/or deposition testimony and medical records which rebut [the] plaintiff's claim of medical malpractice with factual proof." (alteration and internal quotation marks omitted)).

Plaintiffs anticipated that "in opposition to [their] [M]otion, [the Government would] submit reports from [Rashimi Kar, M.D. ('Dr. Kar') or Sara G. Jordan, M.D. ('Dr. Jordan')] wherein they attempt to justify and explain away their egregious care and treatment," an act Plaintiffs label as "gamesmanship" that "has been universally condemned by the courts." (Pls.' Mem. 16.)[3] "It is well settled that under Rule 26(a)(2)(B) of the [Federal Rules of Civil Procedure], a treating physician can provide expert testimony in a deposition or at trial without having submitted a written report." *Coolidge v. United States*, No. 10-CV-363, 2015 WL 5714237, at *7 (W.D.N.Y. Sept. 29, 2015) (internal quotation marks omitted); *see also Williams v. Regus Mgmt. Grp.*, No. 10-CV-8987, 2012 WL 1711378, at *3 (S.D.N.Y. May 11, 2012) ("[T]reating physicians may testify as to opinions formed during their treatment without the obligation to submit an expert report." (alteration omitted)). "A review of Second Circuit jurisprudence indeed illustrates that 'a treating physician fits the definition of an expert who may give opinion testimony . . . , but need not be explicitly designated as an expert witness under the Federal Rules of Civil Procedure Rule 26.'" *Coolidge*, 2015 WL 5714237, at *7 (alterations omitted) (quoting *Barack v. Am. Honda Motor Co., Inc.*, 293 F.R.D. 106, 107 (D. Conn. 2013)). However, "without properly declaring a treating physician as an expert witness, the physician's

---

[3] The Court agrees with the Government that "the cases [P]laintiffs cite in no way support the proposition that Drs. Kar and Jordan should not be permitted to submit declarations in opposition to [P]laintiffs' summary[]judgment [M]otion," as those cases speak to satisfaction of the "serious injury" requirement pursuant to New York insurance law or involve attempts to contradict or backtrack on prior testimony by affidavit. (Gov't's Opp'n 15.)

testimony is limited to certain parameters." *Motta v. First Unum Life Ins. Co.*, No. 09-CV-3674, 2011 WL 4374544, at *3 (E.D.N.Y. Sept. 19, 2011). Thus, a treating physician is not "permitted to render opinions outside the course of treatment and beyond a reasonable reading of the medical records." *Lamere v. N.Y.S. Office for the Aging*, 223 F.R.D. 85, 89 (N.D.N.Y. 2004); *see Barack*, 293 F.R.D. at 109 ("A treating physician who was not designated as an expert witness and failed to prepare the necessary expert report is prohibited from testifying concerning opinions not gleaned from his own diagnosis and treatment of the plaintiff." (internal quotation marks omitted)).

As Plaintiffs predicted, in response to their Motion, the Government cites to the declarations of Drs. Kar and Jordan, and argues that each doctor maintains that her decision to discontinue antibiotics and release Decedent on July 15, 2010

> was justified because [Decedent] had been afebrile for 24 hours, she was given clear instructions to follow up if her condition changed, she had been a responsive and compliant patient, her physical examination on July 16, 2010[] was within normal limits, and she would be seen at home by a visiting nurse service.

(Gov't's Opp'n 13.) Dr. Jordan states in her declaration that she "believed that outpatient observation, in light of [Decedent's] history as a responsive patient, was appropriate," that she "had not developed symptoms or other signs that were concerning, and the physical exam was within normal limits." (Decl. of Dr. Sara Jordan ("Jordan Decl.") ¶¶ 9–10 (Dkt. No. 77).) Medical records from July 13 to July 16, 2010 accompanying the Government's opposition support Dr. Jordan's declaration. (*See* Decl. of Shane Cargo, Esq. ("Cargo Decl.") Ex. A, at 18–33 (Dkt. No. 78).) Dr. Jordan also notes that "[i]t is not uncommon to have transient bacteria in the immediate postpartum period for both immunocompetent and immunosuppressed patients," and she "believed oral antibiotics would not have been effective for a severe systemic infection,

13

and possibly harmful, as they can mask underlying severe systemic infections."  (Jordan Decl. ¶ 11.)[4]

Plaintiff argues that in light of the fact that "neither [Dr. Jordan nor Dr. Kar] bothers to offer an opinion that their care comported with the standard of care," "there is no evidence from any source that the treatment rendered by [them] was reasonable."  (Pls.' Reply 2.)  The Court disagrees.  Although the Government has not offered an expert to opine that Drs. Jordan and Kar comported with the appropriate standard of care, Dr. Jordan's declaration sufficiently "rebut[s] [P]laintiffs['] claim of medical malpractice," *Zikianda*, 2015 WL 5510956, at *6 (alteration omitted), by "rais[ing] a triable issue of fact" as to the propriety of the care rendered by the Government providers who treated Decedent, *Hutchinson*, 2006 WL 1154822, at *6.  A jury could conclude based on the evidence in the record that the decisions of Drs. Jordan and Kar were justified, or merely "error[s] in professional judgment . . . within the range of accepted medical standards."  *Bowes v. Noone*, 748 N.Y.S.2d 440, 443 (App. Div. 2002); *see also Nestorowich v. Ricotta*, 767 N.E.2d 125, 128 (N.Y. 2002) ("Not every instance of failed treatment or diagnosis may be attributed to a doctor's failure to exercise due care."); *Schrempf v. State of New York*, 487 N.E.2d 883, 887 (N.Y. 1985) ("[A doctor] is not required to achieve success in every case and as such, cannot be held liable for mere errors in professional

---

[4] The Court notes that unlike Dr. Jordan's declaration, the declaration of Dr. Kar offers no justification for the decisions taken regarding Decedent's care.  Dr. Kar simply states that upon being notified that Decedent had an elevated temperature, she "ordered a complete blood count . . . as well as blood, urine, and vaginal cultures," and "prescribed empiric antibiotics to be started."  (Decl. of Dr. Rashmi Kar ¶ 6 (Dkt. No. 76).)  Dr. Kar notes that she and Dr. Jordan "agreed to discontinue the antibiotics pending the finalized culture results and determine the appropriate course of treatment as necessary," (*id.* ¶ 7), but unlike that of Dr. Jordan, Dr. Kar's declaration does not provide the rationale behind this decision.

14

judgment.").  Viewing the evidence in the light most favorable to the non-movant, the

Government, the Court finds that there are material issues of fact regarding the standard of care

rendered by the Government providers to Decedent that cannot now be resolved by the Court in

connection with Plaintiffs' Motion.

However, even were the Court to find that Plaintiffs have, as a matter of law, established

that the Government providers breached the standard of care, there remain facts in dispute

regarding whether this breach proximately caused Decedent's death.  "[C]ourts have repeatedly

observed that the issue of causation in a medical malpractice case can be particularly difficult,"

*Ledogar v. Giordano*, 505 N.Y.S.2d 899, 901 (App. Div. 1986), and "[the] [p]laintiff has the

burden of producing expert medical testimony showing proximate cause in medical malpractice

actions," *Hegger v. Green*, 646 F.2d 22, 28 (2d Cir. 1981).  Here, Plaintiffs' expert, Dr. Phillips,

opines that "[w]ith a reasonable degree of medical certainty and probability, the attending

physicians and staff at [HVHC] deviated from accepted medical standards, and these deviations

were substantial factors in causing the death of [Decedent]."  (Friedman Decl. Ex. I, at 4; *see

also* Friedman Decl. Ex. J, at unnumbered 3 ("It is my opinion that . . . had appropriate

intravenous antibiotic and surgical therapies been administered, [Decedent] would have survived

. . . ."); Friedman Decl. Ex. K, at unnumbered 6–7 ("The OB-GYN service and her treating

doctors failed to meet the standards of care and contributed to her unnecessary death. . . .  They

discharged [Decedent] prematurely and incompletely treated her, deviating from standards of

care, causing her harm and ultimately her unnecessary painful death.").)  "These expert opinions

are sufficient to shift the burden to . . . Defendants to produce a triable issue of fact."

*Hutchinson*, 2006 WL 1154822, at *7.

In response, the Government's expert, Dr. Guzman, opines that on presentation to HVHC on July 26, 2010, "at a time when [Decedent's] infection was easily detectable, . . . such detection would have given the [emergency room ('ER')] personnel the opportunity to implement a course of treatment," (Friedman Decl. Ex. L, at 2), and on July 28, 2010, the "visit to the ER again presented an opportunity to diagnos[e] and treat [Decedent's] worsening condition," (*id.* at 3). In addition, the Government contends that

> given that [P]laintiffs' expert Dr. Bergman has pinned partial responsibility on "glaring errors" by Dr. Chung, and posited that [HVHC] had two clear opportunities to save [Decedent's] life, but instead discharged her without antibiotics, and that [Decedent] was also seen at the offices of Drs. Rivas and Polimeni on July 25, 2010, with clear signs of an infection, the fact-finder could find that [HVHC] . . . and not the [G]overnment, is liable for [Decedent's] death.

(Gov't's Opp'n 14 (citations omitted).)

"Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions. Such conflicting expert opinions will raise credibility issues which can only be resolved by a jury." *DiGeronimo v. Fuchs*, 957 N.Y.S.2d 167, 171 (App. Div. 2012) (citations and internal quotation marks omitted). Furthermore, "[t]he issue of whether a doctor's negligence is more likely than not a proximate cause of a plaintiff's injury is usually for the jury to decide." *Polanco v. Reed*, 963 N.Y.S.2d 57, 58 (App. Div. 2013) (alteration and internal quotation marks omitted). Here, in response to Plaintiffs' Motion, the Government has raised questions of fact regarding the proximate cause of Decedent's death that are best left to the finder of fact to resolve. *See Reid v. Soults*, 31 N.Y.S.3d 527, 530 (App. Div. 2016) (finding expert testimony that the defendant "could have used methods to manage the swelling" and could have performed surgical procedures "which could have saved the decedent's

16

life" were "sufficient to raise triable issues of fact" as to proximate cause and to preclude

granting summary judgment). Accordingly, Plaintiffs' Motion for Summary Judgment is denied.

### 2. Dr. Shah's Motion for Summary Judgment

In support of his Motion for Summary Judgment, Intervenor Defendant Dr. Shah argues

that "dismissal of the entire complaint as against him" is warranted "on the basis that there is no

triable issue of fact as to proximate cause." (Mem. of Law in Supp. of Mot. for Summ. J.

Pursuant to F.R.C.P. 56 ("Shah's Mem.") 1 (Dkt. No. 65).) Dr. Shah asserts that "[t]he proof

shows . . . that during the 15-day period between [Decedent's] delivery and the treatment by Dr.

Shah on July 28th, which was the first and last time Dr. Shah ever saw her, the infection had

progressed and reached an irreversible course" and "no treatment that could have been initiated

at that point would have changed the outcome." (*Id.*)

In support of his Motion, Dr. Shah submits the affidavit of Infectious Disease Expert Dial

Hewlett, Jr., M.D. ("Dr. Hewlett") which states the following:

> [O]n the morning of July 28, 2010, despite the absence of many of the many typical
> manifestations of sepsis, the patient was in overwhelming irreversible septic
> shock[;] . . . by the morning of July 28, 2010, the patient was severely septic and
> her course had become irreversible[;] . . . even if equally aggressive measures had
> been taken at [HVHC] [when Dr. Shah saw Decedent], [she] would still have not
> responded and would have had the same outcome[; and] . . . nothing that could have
> been done . . . when [Decedent] was seen by [D]efendant Dr. Shah . . . would have
> changed the outcome of this patient.

(Decl. of Gary W. Patterson, Jr., Esq. in Supp. of Mot. for Summ. J. on behalf of Def. Sachin

Shah, M.D. ("Patterson Decl.") Ex. Q ("Hewlett Aff.") ¶¶ 28–29, 31 (Dkt. No. 64).) In response,

Plaintiffs contend that "[a]s set forth in the affidavit of [Dr.] Bergman, . . . the treatment rendered

by Dr. Shah clearly deprived [Decedent] of the opportunity to be cured." (Pls.' Mem. of Law in

17

Opp'n to Intervenor Def. Sachin Shah, M.D.'s Mot. for Summ. J. on the Issue of Proximate

Cause ("Pls.' Opp'n") 3 (Dkt. No. 69).)  Dr. Bergman's affidavit states

> The failure to perform [a] vaginal and adnexal examination [on Decedent] on July
> 28, 2010, deprived [Decedent] of the chance for gynecologic intervention and
> potential cure.  Proper treatment was not commenced until after 1:51 P.M. at
> [WMC].  The delay caused by Dr. Shah's departures from the standard of care was
> nearly seven hours[;] . . . WMC records indicate that antibiotics . . . were not
> commenced until approximately 2:00 A.M. on July 29, nearly 19 hours after
> [Decedent] presented to Dr. Shah.  This lengthy delay certainly increased the
> likelihood that proper treatment would be ineffective, and deprived [Decedent] of
> the opportunity for a cure, and contributed to her demise[;] . . . Hospitalization,
> along with urgent Obstetric/Gynecologic surgical intervention and appropriate
> antibiotic therapy and supportive care, would have prevented the death of
> [Decedent] on . . . July 28, 2010[; and] . . . Dr. Shah's failure to properly evaluate
> the patient deprived her of the opportunity for timely O[B]/G[YN] intervention and
> removal of the group A infected endometrial tissue, which would have had the
> immediate result of removing the toxin as well as the infection.  A cure could have
> resulted from such intervention, which opportunity was lost because of Dr. Shah's
> departures from the standard of care, and the resultant 19 hour delay until antibiotic
> therapy was commenced.

(Decl. of Andrew M. Friedman, Esq. in Opp'n to Def. Shah's Mot. for Summ. J. Ex. A

("Bergman Aff.") ¶¶ 4–5 (Dkt. No. 68).)  Plaintiffs assert that "[a]t minimum, Dr. Bergman's

affidavit demonstrates that issues of fact exist."  (Pls.' Opp'n 3; *see also id.* at 4 ("The many

differences of opinion between [P]laintiff[s'] expert and movant's expert highlights the existence

of genuine issues of triable fact herein.  These issues require determination by a finder of fact.").)

As noted, "[s]ummary judgment is not appropriate in a medical malpractice action where

the parties adduce conflicting medical expert opinions because such conflicting expert opinions

will raise credibility issues which can only be resolved by a jury."  *Cummings v. Brooklyn Hosp.

Ctr.*, 48 N.Y.S.3d 420, 422 (App. Div. 2017) (alteration and internal quotation marks omitted);

*see also Thibault v. Siouffi*, No. 12-CV-1183, 2015 WL 12564222, at *10 (N.D.N.Y. Mar. 11,

2015) (same); *see also Malbranche v. Sunnyview Rehab. Hosp.*, No. 2002/2310, 2006 WL

6143141, at *3 (N.Y. Sup. Ct. June 6, 2006) ("It is well settled that conflicting medical opinions in a medical malpractice action create a credibility question for the jury to resolve, precluding summary judgment in favor of either party.").  However, here, Dr. Shah argues that the Plaintiffs' expert's affidavit in opposition "is riddled with factual errors and speculation." (Reply Mem. in Supp. of Mot. for Summ. J. ("Shah's Reply") 1 (Dkt. No. 80).)  In particular, Dr. Shah identifies factual errors in connection with Plaintiffs' claims that Dr. Shah (1) failed to perform a vaginal and adnexal examination and (2) failed to administer antibiotics until nearly 19 hours after Decedent presented to Dr. Shah.

As to the failure to perform the vaginal and adnexal exam, Dr. Bergman's affidavit states that

> Proper management of [Decedent] both on her July 26, 2010 and July 28, 2010 HVHC [Emergency Ward ("EW")] visits required a . . . comprehensive physical examination.  Indeed, the EW examinations on both of these dates failed to include a vaginal and adnexal examination in this postpartum patient with sepsis. The adnexal exam performed at the subsequent facility on July 29, 2010 demonstrated classic adnexal tenderness as well as purulent vaginal drainage.  The failure to perform this vaginal and adnexal examination [on Decedent] on July 28, 2010 *deprived [Decedent] of the chance for gynecologic intervention and potential cure*.

(Bergman Aff. ¶ 4 (emphasis added).)  Dr. Shah contends that this statement "conveniently ignores the fact that an O[B]/G[YN] specialist provided a consultation in the emergency room at 7:30 P.M. on July 28, 2010 and performed a vaginal examination as seen [in Decedent's chart from WMC]."  (Shah's Reply 2 (emphasis omitted); *see also id.* at 8 ("[T]he expert's conclusion . . . rests upon the mistaken assumption that no vaginal exam was performed until July 29, 2010.").)  The Court does not agree that "Plaintiff[s'] expert assumes that . . . no vaginal exam was performed until [July 29, 2010]."  (*Id.* at 9 n.2.)  Rather, Dr. Bergman's affidavit asserts that

examination of Decedent *at HVHC, where Dr. Shah treated Decedent*, "failed to include a vaginal and adnexal examination." (Bergman Aff. ¶ 4.) That is, Dr. Bergman does not contend that *no* vaginal exam was performed that day, but rather that no such exam was performed at *HVHC*. This reading is supported by Dr. Bergman's assertion that "hospitalization, along with urgent Obstetric/Gynecologic surgical intervention and appropriate antibiotic therapy and supportive care, would have prevented the death of [Decedent] on either the July 26 and July 28, 2010 *HVHC EW visits*." (*Id. ¶ 5* (emphasis added).)

As to the administration of antibiotics, the Court agrees with Dr. Shah that Dr. Bergman's statements regarding this aspect of Decedent's treatment are inaccurate. The WMC records do not "indicate that antibiotics . . . were not commenced until approximately 2:00 A.M. on July 29, [2010,] nearly 19 hours after [Decedent] presented to Dr. Shah." (*Id.* ¶ 5) As Dr. Shah's Reply identifies, WMC's medical records, which Dr. Bergman attested that he reviewed, (*see* Friedman Decl. Ex. J, at unnumbered 2), indicate that Decedent was given antibiotics beginning at 3:30 P.M. on July 28, 2010, shortly after her arrival at WMC, (*see* Patterson Decl. Ex. M, at 39–40, 43, 48, 68–69).

"A minor factual error that is largely irrelevant to the ultimate opinion does not render an expert's testimony inadmissible." *Boykin v. Western Exp., Inc.*, No. 12-CV-7428, 2015 WL 539423, at *9 n.9 (S.D.N.Y. Feb. 6, 2015). However, here Plaintiffs' expert explicitly states that the "*lengthy delay* certainly increased the likelihood that proper treatment would be ineffective, and deprived [Decedent] of the opportunity for a cure, and contributed to her demise," and that this "opportunity was lost because of Dr. Shah's departures from the standard of care, *and the resultant 19 hour delay until antibiotic therapy was commenced*." (Bergman Aff. ¶¶ 4–5

(emphasis added).)  The Court thus agrees with Dr. Shah that Dr. Bergman's affidavit is insufficient to raise a triable issue of fact based on the assertion that the 19-hour delay in antibiotic treatment from when Dr. Shah treated Decedent was the proximate cause of Decedent's death.

However, to the extent Dr. Bergman's affidavit contains statements that are not dependent on this factual error, the Court will consider Dr. Bergman's expert opinions.  *See In re Ephedra Prods. Liability Litig.*, 494 F. Supp. 2d 256, 257–58 (S.D.N.Y. 2007) (finding that where an "expert's report [was] based on factual errors of [a] magnitude [t]here present," the court would "allow [the expert's] testimony concerning the opinions contained in his report that [did] not relate to [the error]" and the "remainder of [a certain] statement from [the expert's] report [would be] admissible if [it were] proffered as testimony at trial").  For example, Dr. Bergman opines that "Dr. Shah's failure to properly evaluate [Decedent] deprived her of the opportunity for timely O[B]/G[YN] intervention and removal of the group A infected endometrial tissue, which would have had the immediate result of removing the toxin as well as the infection."  (Bergman Aff. ¶ 5.)  Additionally, Dr. Bergman contends that "[t]he failure to perform [a] vaginal and adnexal examination [on Decedent] on July 28, 2010," when Decedent presented to Dr. Shah at HVHC, "deprived [Decedent] of the chance for gynecologic intervention and potential cure."  (*Id.* ¶ 4.)  These opinions directly conflict with those of Dr. Hewlett, and therefore preclude the Court from granting summary judgment.

Finally, Dr. Shah asserts that "[e]ven looking past the expert's factual error, the conclusion that O[B]/G[YN] intervention 'may have' or 'could have' been lifesaving is speculative and insufficient to raise a triable issue of fact."  (Shah's Reply 8.)  While "[a]n expert

opinion offering only conclusory and speculative assertions is insufficient to support a judgment in [the] [p]laintiff's favor," *Hersko v. United States*, No. 13-CV-3255, 2017 WL 1957272, at *6 (S.D.N.Y. May 11, 2017), none of the cases Dr. Shah cites in support of this proposition is analogous to the facts at hand. Dr. Shah's assertion that Dr. Bergman's opinion is speculative appears to be based entirely on the language Dr. Bergman employed in his opinion: that "O[B]/G[YN] intervention *may have* been lifesaving" and "[a] cure *could have* resulted from such intervention." (Shah's Reply 8 (internal quotation marks omitted).) However, no expert could definitively conclude what *would have* happened under an alternative set of facts. In this sense, all opinions with regard to proximate cause are speculative. Indeed, Dr. Bergman launched a similar attack on Dr. Hewlett's expert opinion, arguing that "Dr. Hewlett['s] comment that [Decedent's] death from group A streptococcal endometritis with overwhelming septic shock was already a foregone conclusion by the time that [Decedent] was first evaluated by Dr. Sachin Shah . . . *is purely speculative* and is a failed attempt at dismissing Dr. Shah's suboptimal care." (Bergman Aff. ¶ 3 (emphasis added).) Accordingly, the Court finds that there remains issues of material fact with respect to the proximate cause of Decedent's death, and, therefore, Dr. Shah's Motion for Summary Judgment is denied.[5]

---

[5] The Court notes that in addition to Dr. Bergman's opinion creating a triable issue of material fact, the opinion of the Government's expert, Dr. Guzman, also conflicts with that of Dr. Hewlett. (*See* Friedman Decl. Ex. L, at 3 ("[T]he [HVHC] ER should have performed blood work and reviewed the prior available records. Second, [Decedent] should not have been shortly discharged after receiving I.V. Dilaudid. . . . [T]he [July 28] visit to the [HVHC] ER . . . presented an opportunity to diagnos[e] and treat [Decedent's] worsening infection.").)

## III. Conclusion

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment and Defendant Dr.

Shah's Motion for Summary Judgment are denied.

The Court will hold a status conference on October 30, 2017 at 11:00 A.M.

The Clerk of Court is respectfully requested to terminate the pending Motions. (*See* Dkt.

Nos. 59, 63.)

SO ORDERED.

Dated:     September 27, 2017
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE